Aaron M. Panner (*pro hac vice* to be filed)
David L. Schwarz (Bar No. 206257)
Thomas G. Schultz (*pro hac vice* to be filed)
Mark P. Hirschboeck (*pro hac vice* to be filed)
Rachel A. DeLisle (*pro hac vice* to be filed)
Drew T. Beussink (*pro hac vice* to be filed)
Hojoon Kim (*pro hac vice* to be filed)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
dschwarz@kellogghansen.com
tschultz@kellogghansen.com
mhirschboeck@kellogghansen.com
rdelisle@kellogghansen.com
dbeussink@kellogghansen.com
hkim@kellogghansen.com

John D. Pernick (Bar No. 155468)
Andrew Johnson (Bar No. 322069)
BERGESON, LLP
111 N. Market St., Suite 600
San Jose, CA 95113
(408) 291-6200
jpernick@be-law.com
ajohnson@be-law.com

*Attorneys for Newsmax Broadcasting, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| NEWSMAX BROADCASTING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FOX CORPORATION AND ROKU, LLC,<br><br>Defendants. | Case No. __________________<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF** |

COMES NOW Plaintiff Newsmax Broadcasting, LLC, to allege as follows:

## INTRODUCTION

1. On November 6, 2026, media giant Fox Corporation ("Fox") announced that it had closed its $22 billion acquisition of Roku, Inc. ("Roku"). Roku is a leader in Connected TVs – a critical distribution channel – and owns a key streaming service ("The Roku Channel" or "TRC") that competes directly with Fox's Tubi streaming service. The timing of the closing was unexpected. After Fox and Roku announced the deal, the Department of Justice ("DOJ") determined that it could not be quickly waved through and instead required close scrutiny under the Hart-Scott-Rodino Act. In light of that investigation, Roku publicly stated that it did not expect to close the merger until the first quarter of 2027. As recently as September 2026, Fox's COO reiterated: "We said it would close in the first half of 2027. We're not changing that at all." The sudden announcement that the merger had closed – months earlier than Fox and Roku publicly projected, and before DOJ announced that it had completed its investigation – surprised the industry.

2. Several hours *after* Fox and Roku announced the closing, DOJ issued a press release stating that it would not challenge the transaction. But the press release raised more questions than it answered. It suggested that DOJ declined to act only because of a series of bullet-point "commitments" by Fox apparently designed to alleviate the merger's competitive concerns. According to the press release, Fox promised not to use its ownership of Roku to "discriminate against non-FOX content." Fox apparently promised to continue "carrying non-FOX content on Roku." And the press release listed other so-called "commitments" as well.

3. But when a transaction is likely to harm competition absent conduct remedies of the sort to which Fox supposedly "committed," DOJ's practice is to negotiate a consent decree that sets out those commitments. The consent decree is then released to the public and reviewed by the court under the Tunney Act, 15 U.S.C. § 16. That procedure ensures that the merging parties' obligations are clear and enforceable – something four bullet points in a press release fail to achieve. Fox's "commitments" are ill-defined and have no evident enforcement mechanism.

4. Shortly after Fox's surprise merger announcement, Newsmax contacted Fox to explain its concern that Fox's "commitments" in DOJ's press release had no clear means of

enforcement. Newsmax asked Fox if it would sign a binding contract making these commitments enforceable and sent Fox a proposed term sheet reflecting these commitments. Fox rejected Newsmax's term sheet and declined even to make a counterproposal, accentuating concerns that Fox's "commitments" to DOJ were entirely empty.

5. The press release – and Fox's failure to stand behind the commitments reflected in that press release – therefore only heightens, rather than resolves, the obvious competitive concerns raised by combining TRC and Tubi under common ownership. TRC and Tubi are "FAST" services – free, ad-supported streaming television services – that provide linear television channels (rather than just on-demand content) for free over the Internet. The press release implicitly recognizes that free, ad-supported streaming services constitute a distinct antitrust market – as indeed they do. And TRC and Tubi are the two leading FAST services, with a combined market share of more than 70%. DOJ virtually never clears a transaction combining the two leading competitors in a concentrated market; it typically demands divestiture of one or the other to protect competition.

6. In this case, however, DOJ allowed this merger to an effective monopoly to close unchallenged. The press release explains this unprecedented decision by stating that DOJ expects future entry to constrain Fox's market power. But Newsmax is aware of no case in which DOJ has approved a merger to monopoly based on the vague hope of future entry. Nor would the kind of entry DOJ apparently anticipated be sufficient. To replace the competition this merger eliminates, an entrant would need to replicate the scale, strength, and durability of The Roku Channel or Tubi – services built over many years with the benefit of established device distribution. Relying on future entry is especially perplexing because Roku controls the *most* important distribution channel for FAST services – the Roku Operating System. Any prospective FAST entrant would understand that the dominant FAST competitor also dominates distribution. Even if Fox's "commitments" meaningfully addressed that concern – and they plainly do not – they last only three years, a fraction of the seven-to-ten-year life of the Roku-powered televisions already in consumers' homes. Why would anyone try to enter the FAST market with such precarious access to distribution?

7. In sum, far from alleviating the competitive concerns raised by the merger to monopoly between Fox and Roku, DOJ's unusual press release – and Fox's failure to stand by the

commitments in that press release – underscores the need for judicial intervention. As the press release effectively acknowledges, Fox's ownership of Roku creates substantial vertical foreclosure concerns: a leading content provider will control its competitors' access to a critical distribution channel. At a minimum, those concerns must be addressed through enforceable behavioral conditions that prevent Fox from disadvantaging rival content providers.

8. Just as important, Fox should not be permitted to maintain ownership of both TRC and Tubi, given the effective monopoly that such ownership creates. The merger must therefore be unwound *unless* Fox divests either Tubi or TRC.

9. Absent effective relief, Newsmax will suffer imminent and irreparable harm. Newsmax creates news content that competes with Fox's news programming. Newsmax also relies on free streaming services, including TRC, for distribution of its channels. Newsmax therefore depends on healthy competition between free streaming services to ensure that its content is licensed for fair prices and provided to consumers on fair terms.

10. These concerns are not merely hypothetical. Fox has a long history of anticompetitive animus toward Newsmax. Most notably, Fox has refused to carry Newsmax on Fox's own free streaming service, Tubi. Now that Fox has acquired Roku – along with TRC – the risk that Fox will further degrade distribution of Newsmax's content is clear.

11. Newsmax therefore brings this action to enjoin the Fox-Roku merger, including through a hold-separate order until the Court can determine whether – and on what enforceable conditions – the merger may proceed. The antitrust laws forbid acquisitions whose effect may be to substantially lessen competition or tend to create a monopoly. *See* 15 U.S.C. § 18. Fox's acquisition of Roku is highly likely to have these effects. The Court should issue a preliminary injunction ordering Fox to halt all integration activities and to maintain Roku as a separate, independently managed business pending adjudication of this Complaint on the merits. That relief will preserve the Court's ability to order divestiture to remedy Fox's unlawful acquisition.

## PARTIES

### A. Plaintiff

12. Plaintiff Newsmax Broadcasting, LLC is a Florida limited liability company with its principal place of business at 750 Park of Commerce Drive, Suite 100, Boca Raton, Florida 33487, with the telephone number (561) 686-1165.

13. Newsmax is a news and media company that owns and operates Newsmax TV and distributes news programming to consumers across the United States, including through a FAST channel, Newsmax2, carried on The Roku Channel, among other platforms.

### B. Defendants

14. Defendant Fox Corporation is a public company incorporated in Delaware with its principal place of business at 1211 Avenue of the Americas, New York, New York 10036, with the telephone number (212) 852-7000. Fox owns and operates, among other properties, the Fox News Channel – the cable news channel with the highest viewership in the United States – and Tubi, a free, ad-supported streaming service that Fox acquired in 2020. Fox distributes a substantial amount of its own content through Tubi, including live programming and networks such as FOX, FOX Sports, and LiveNOW from FOX.

15. Defendant Roku, LLC is a public company incorporated in Delaware with its principal place of business at 1173 Coleman Avenue, San Jose, California 95110, with the telephone number (408) 556-9040. On information and belief based on publicly available information, Roku, LLC is the successor company to Roku, Inc. Roku owns and operates, among other properties, The Roku Channel, the leading free, ad-supported streaming service in the United States, and the Roku OS, the leading connected-television platform in the United States.

## JURISDICTION AND VENUE

16. This action arises, in part, under Section 7 of the Clayton Act, 15 U.S.C. § 18.

17. This Court has subject-matter jurisdiction over the claims under 28 U.S.C. §§ 1331 and 1337(a), as well as through Section 16 of the Clayton Act, 15 U.S.C. § 26.

18. Venue in this District is proper under Sections 12 and 16 of the Clayton Act, 15 U.S.C. §§ 22 and 26, and 28 U.S.C. § 1391(b) and (c), because each Defendant resides in, transacts

business in, is found in, or has an agent in this District. Venue is also appropriate because Roku has consented to exclusive venue in this District with respect to disputes arising from or related to the relationship between Roku and Newsmax.

19. This Court has personal jurisdiction over each Defendant under Sections 12 and 16 of the Clayton Act, 15 U.S.C. §§ 22 and 26, because each Defendant resides, transacts business, or may be found in this District.

20. Fox maintains offices in and transacts business in this District. Fox's FAST platform Tubi is headquartered in this District, and Fox owns and operates several broadcast stations in this District.

21. Roku resides in and transacts business in this District. Roku's headquarters are in San Jose, California. Roku sells its products, including Roku televisions and Roku streaming devices, in this District, and customers use those devices to watch FAST channels on The Roku Channel in this District. Roku has a registered agent located in this District.

22. All Defendants' conduct substantially affects interstate trade and commerce and their anticompetitive merger would likewise harm competition in interstate commerce by decreasing quality and choice, to the detriment of Newsmax and consumers nationwide.

23. **Divisional Assignment.** This action is properly assigned to the San Jose division, as Roku's contract with Newsmax consents to exclusive venue in Santa Clara County, California. Moreover, on information and belief, Roku's actions giving rise to this action occurred in its headquarters in San Jose, California.

## FACTUAL BACKGROUND

### I. THE BIRTH OF FREE AD-SUPPORTED STREAMING TV

24. For decades, most consumers watched television on traditional box television sets in their homes. In the early days of television, most consumers received TV channels broadcast over radio waves through an antenna – a medium known as "broadcast" television. Broadcast television was free to consumers.

25. Beginning in the late 1970s, broadcast television began to give way to a new television medium, called cable television. Cable companies, such as Comcast and Charter, transmit

television signals through hardwire cables in the ground. In the 1990s, satellite companies such as DirecTV and DISH joined the ranks of cable companies by transmitting television signals via satellite. Unlike broadcast television stations, cable and satellite companies – called multichannel video programming distributors, or MVPDs – charge consumers a monthly subscription fee in exchange for access to a package of dozens or hundreds of channels. The U.S. median price of cable and/or satellite TV is $125 per month.[1]

26. The "cable bundle" quickly overtook broadcast television and became the dominant paradigm of television viewing in the United States. By 2000, roughly 90% of U.S. households subscribed to cable or satellite television.

27. Beginning around 2010, the cable model began to recede. Over the next decade, millions of American consumers canceled their cable and satellite subscriptions in favor of Internet-delivered alternatives – a trend known as "cord-cutting." The percentage of U.S. households subscribing to cable or satellite fell from 88% in 2010 to less than 35% by 2025.[2] Many younger consumers, often called "cord-nevers," have never subscribed to cable or satellite television.

28. These cord-cutters and cord-nevers flocked to streaming television services, which use the Internet to deliver TV content to consumers.

29. The first wave of streaming services was Streaming Video-on-Demand ("SVOD") services. SVODs charge consumers monthly subscription fees – typically between $10 and $20 per month – to access a library of on-demand television content. Netflix pioneered the SVOD model; it launched in 2007 and grew to 100 million subscribers 10 years later. Other SVODs followed, including Disney+, HBO Max, and Peacock.

30. Around 2015, a second wave of streaming services appeared: live TV streaming

---

[1] Ted Hearn, *At $125 a Month, Cable TV Nearly as Expensive as Typical Monthly Home Electric Bill, Report Finds*, Broadband Breakfast (Aug. 28, 2026), https://broadbandbreakfast.com/at-125-a-month-cable-tv-nearly-as-expensive-as-typical-monthly-home-electric-bill-report-finds/.

[2] Alex Rivera, *Cord-Cutting Statistics 2026: 80.7 Million Households, 47.5% Streaming Share, and the End of Cable's Majority*, Axis Intelligence (June 29, 2026), https://axis-intelligence.com/cord-cutting-statistics/.

services, also known as virtual MVPDs. Unlike SVODs, virtual MVPDs offered packages of live television channels – similar to the packages offered by cable and satellite companies – instead of an on-demand library of content. Virtual MVPDs appealed to sports fans, who generally prefer to watch sports live. Like SVODs and MVPDs before them, virtual MVPDs charge consumers a monthly subscription fee – typically between $60 and $120 per month. Today, YouTube TV, Hulu + Live TV, Fubo, and Sling are the leading virtual MVPDs.

31. Consumers often cut the cord hoping that streaming would cost less than traditional MVPD service. But as a September 2026 *Fortune* article explains: "Cord-cutters escaped the cable bundle only to rebuild it, one streaming subscription at a time."[3] Subscribing to eight major ad-free streaming services now costs $139.41 per month. Even the ad-supported versions of those services lower that bill only to $89.92. Adjusted for inflation, consumers now pay about as much for streaming as they once paid for bloated cable packages.[4] As paid streaming prices rise, price-sensitive consumers – for whom paid subscriptions are not a practical alternative – increasingly rely on free services.[5]

32. In recent years, a third wave of streaming services has emerged in response to rising subscription costs. "Free, ad-supported streaming television" ("FAST") platforms offer live television channels that viewers can watch for free over the Internet without any subscription. FAST platforms, like Tubi and The Roku Channel, package FAST channels together on a single service, similar to a cable bundle. Some FAST platforms also include separate video-on-demand offerings.

33. FAST channels are designed to replicate the experience of traditional television. Each channel runs a fixed schedule that viewers browse through an on-screen program guide, and

---

[3] Tatiana Sataua, *Cutting the cord was supposed to save money. Eight streaming services now cost a combined $139 a month*, Fortune (Sept. 9, 2026), https://finance.yahoo.com/media-advertising/articles/cutting-cord-supposed-save-money-150426876.html?guccounter=1.

[4] *Id.* ("In 2016, the average pay-TV bill reached $103.10 a month, according to Leichtman Research Group data. Based on the Consumer Price Index, that 2016 bill would equal approximately $143 in July 2026 - only about $4 more than today's $139.41 ad-free streaming lineup.").

[5] *Best Free TV Streaming Services: Tubi, Roku Channel and More*, CNET (May 19, 2026), https://www.cnet.com/tech/services-and-software/best-free-tv-streaming-services/.

the programming is interrupted by regular commercial breaks.[6] As one industry participant has explained: "Free Ad-Supported Streaming TV (FAST) is a digital streaming model where viewers access live, linear channels – completely free of charge – in exchange for watching ads. Think of FAST as the modern reinvention of traditional broadcast TV, but streamed over the internet and monetized entirely through advertising."[7]

34. FAST channels differ from cable, satellite, and Internet-delivered pay-TV bundles because they require no pay-TV provider, no contract, and no subscription fee. In contrast to cable companies, SVODs, and virtual MVPDs, which earn money through subscription fees, FAST channels generate revenue through ads.[8]

35. FAST channels differ from broadcast television because they are delivered over an Internet connection rather than over the air. For that reason, FAST channels do not require consumers to purchase an antenna. And unlike broadcast channels, which are limited in number due to the finite amount of radio frequency spectrum, the number of FAST channels a customer can receive is potentially infinite.

36. FAST channels also differ from other streaming services. SVODs like Netflix charge a recurring fee and let viewers choose titles on demand. Lower-priced ad-supported tiers of those services still require payment and are not FAST. "Unlike SVOD (Subscription Video on Demand) services, FAST doesn't require subscriptions, logins, or payment credentials, making it an accessible and fast-growing part of the streaming ecosystem."[9]

37. FAST channels also differ from purely on-demand streaming services because FAST channels do not require viewers to browse through libraries of content to select individual shows to play. Instead, FAST viewers have the option to browse a guide of available linear channels (or, for

---

[6] *See 5 Things Advertisers Need to Know About FAST Channels*, Roku Advert. (June 11, 2026), https://advertising.roku.com/en-ca/learn/resources/5-things-advertisers-need-to-know-about-fast-channels.

[7] *FAST (Free Ad-supported Streaming TV)*, Wurl, https://www.wurl.com/glossary/fast/.

[8] *Id.*

[9] *Id.*

some FAST platforms, also browse a companion on-demand content catalog). As Roku has explained: "FAST channels enable the lean-back experience. Streamers are tired of scrolling through menus, trying to find something to watch. With their 24/7 scheduled programming, FAST channels free streamers from this stressful experience."[10]

38. FAST channels and services thus serve a distinct demand within the broader television ecosystem. As one industry publication notes, "FAST TV is tucked in between the worlds of cable TV and subscription-based streaming, and it's a billion-dollar industry that's changed how we watch TV."[11] Roku itself offers investors the following chart to explain FAST's place within the television landscape:




39. Roku's chart illustrates three fundamental distinctions among television services in the United States today. *First*, there is an important distinction between "traditional TV" – broadcast, cable, and satellite – and "streaming TV," which includes services "distributed via the

[10] *See 5 Things Advertisers Need to Know About FAST Channels*, Roku Advert. (June 11, 2026), https://advertising.roku.com/en-ca/learn/resources/5-things-advertisers-need-to-know-about-fast-channels.

[11] Kourtnee Jackson, *FAST TV: What It Is and Why It Should Matter to You*, CNET (Nov. 18, 2023), https://www.cnet.com/tech/services-and-software/fast-tv-what-it-is-and-why-it-should-matter-to-you/.

internet." *Second*, there is an important distinction between "paid streaming TV" – such as SVODs and virtual MVPDs that charge monthly subscription fees – and "free streaming TV," for which viewers pay nothing. *Third*, there is an important distinction between "video on demand" services and live television: the former requires viewers to navigate libraries of content, while the latter resembles traditional cable or broadcast television with scheduled programming. As the chart illustrates, FAST channels are distinct from other forms of television: they are streaming (not traditional), free (not subscription-based), and live (not on-demand).

40. FAST viewership has skyrocketed in recent years. FAST viewing hours for the month of August rose 43% year over year from 2024 to 2025, from 1.3 billion to 1.8 billion hours.[12] By mid-2026, the headline remained the same: FAST "is the fastest-growing segment in television."[13]

## II. THE FAST ECOSYSTEM

41. When an American consumer watches a FAST channel, a web of companies behind the scenes interact to create, package, and distribute that content to the screen. Fox and Roku operate at multiple levels of this ecosystem, and understanding this ecosystem is essential to understanding the anticompetitive effects of Defendants' merger:

a. At the top layer of the ecosystem are programmers that create and operate individual FAST channels. Newsmax and Fox are both programmers.

b. At the second layer are FAST platforms, which license FAST channels from programmers and aggregate them into a single, free package accessible through the platform's channel guide or user interface. Tubi and The Roku Channel are FAST platforms distributed as standalone apps on connected TV devices (e.g., Roku, Samsung, LG, Fire TV).

c. At the third layer of the ecosystem are the hardware devices that consumers use

[12] Travis Clark, *FAST viewing has surged 43% in the US since last year*, Current (Nov. 25, 2025), https://www.thecurrent.com/marketing/readout-fast-viewing-surged-us-streaming.

[13] Pallavi Rajpurohit, *Streaming 2026: Why FAST viewership is growing faster than its revenue*, amagi (Mar. 23, 2026), https://www.amagi.com/blog/fast-streaming-revenue-nielsen.

to watch FAST channels. Typically, consumers watch FAST channels on Connected TV platforms (or "CTVs") with Internet provided by a broadband provider. Roku operates the dominant CTV.

d. At the bottom layer of the ecosystem are consumers, who access FAST channels through FAST services and Connected TVs.

**A. FAST Services**

42. Today, three FAST platforms – The Roku Channel, Tubi, and Pluto TV – account for the vast majority of the FAST market.

43. The Roku Channel is a FAST platform owned by Roku. Despite its name, TRC is not a single channel but a free platform where viewers can choose among more than 500 FAST channels, as well as some free video-on-demand offerings. In April 2026, TRC reported that it had surpassed 100 million monthly users – a "defining moment" for the company.[14] Roku monetizes TRC primarily through advertising. TRC offers films, television series, live linear television, and other content, including original programming that Roku commissions, owns, and distributes under the Roku Originals banner. As of December 2025, TRC accounted for approximately 43% of the FAST market, measured by share of television viewing time.

44. Tubi is Fox's FAST platform where viewers can watch more than 340 FAST channels in addition to a large video-on-demand library.[15] Viewers can access Tubi through "the vast majority of streaming platforms, including connected television devices, online at tubitv.com and on iOS and Android devices and platforms."[16] From mid-2025 to mid-2026, Tubi generated 13 billion hours of total view time[17] and nearly $1.5 billion in revenue. In August 2026, Tubi reported

---

[14] Todd Spangler, *Roku Tops 100 Million Streaming Households*, Variety (Apr. 16, 2026), https://variety.com/2026/digital/news/roku-100-million-streaming-households-1236722689/.

[15] Fox 2026 Form 10-K at 9 (Aug. 6, 2026), https://www.sec.gov/Archives/edgar/data/1754301/000162828026053960/fox-20260630.htm.

[16] *Id.*

[17] *Id.*

that it had reached 110 million monthly active users.[18] As of December 2025, Tubi accounted for approximately 28% of the FAST market, measured by share of television viewing time.

45. Pluto TV is a FAST platform owned and operated by Paramount. Like Tubi and TRC, Pluto TV offers hundreds of FAST channels as well as some video-on-demand content. Pluto TV is available through connected television devices, over the Internet, or via mobile. In late 2025, Pluto TV reached an estimated 89.6 million monthly active users.[19] Pluto TV represents approximately 18% of the FAST market, measured by share of television viewing time.

46. In addition to these three FAST platforms, there are a handful of much smaller platforms, including Samsung TV+, Xumo Play, and Plex. As of December 2025, these smaller streaming services accounted for approximately 11% of the FAST market, measured by share of television viewing time.

**B. Connected TVs**

47. The streaming revolution impacted not just how Americans watch television but also the physical and visual interfaces they navigate to do so. Today, American homes are dominated by Connected TV platforms. CTVs are Internet-connected devices that connect television-style video programming to a television screen through the TV's operating system. Ninety percent of American households have one or more Internet-connected televisions.[20] And CTVs command nearly half of all TV viewing time in the United States.[21]

48. There are two main forms of CTVs: (1) smart TVs, which are television sets that

---

[18] Chris Stokel-Walker, *2026 TIME Executives of the Year: Tech and Data*, Time (Sept. 22, 2026), https://time.com/collection/executives-of-the-year-tech-data/2026/mike-bidgoli/.

[19] James Faris, *Internal Paramount Presentation Reveals Its 2026 Streaming Goals - and How Much Viewership Has Grown*, Bus. Insider (Apr. 23, 2026), https://www.businessinsider.com/leaked-paramount-presentation-streaming-goals-viewership-pluto-tv-wbd-deal-2026-4.

[20] Kayla Wassell, *Almost 90% of U.S. Households Use Internet Connected TVs to Stream*, Cord Cutters News (June 11, 2023), https://cordcuttersnews.com/almost-90-of-u-s-households-use-internet-connected-tvs-to-stream/.

[21] Sarah Moss, *Connected TV Statistics 2026: Key Trends, Audience Insights, and Advertising Opportunities*, AI Digital (updated June 2026), https://www.aidigital.com/blog/connected-tv-stats.

come with an Internet-connected operating system (like a Samsung Smart TV), and (2) streaming media devices that connect to a television and provide an Internet-connected interface (such as Amazon Fire Stick or Apple TV).

49. Roku, at its core, is an operating system that is available in both forms of CTV – Roku-branded TVs or other manufacturer devices that are sold with the Roku OS built in, and Roku streaming devices that can be plugged into any television and then connected to the Internet. Roku-branded TVs come with the Roku OS pre-installed, and consumers cannot change to a different OS. Roku streaming devices allow consumers to use the Roku OS on non-Roku-branded televisions.

50. Below is an image of a Roku home screen. The user can use the Roku remote (pictured to the bottom left of the image) to navigate to various streaming apps (like The Roku Channel, Netflix, etc.). Whether a user has a Roku TV or just a Roku streaming device plugged into their existing TV, this is the interface that they see:




51. Roku is the dominant CTV provider and the gateway to tens of millions of Americans. As the company advertises, it attracts 44% of the hours spent viewing CTV content in

the United States.[22]




52. Roku's dominance in the CTV market is durable. On average, modern smart televisions last seven to ten years. Because consumers replace smart TVs infrequently, Roku can degrade the quality of its products for long periods without causing users to switch.

53. Roku, as the leading CTV provider, exercises significant power over owners of FAST channels and streaming applications (e.g., Paramount+, Peacock) more broadly.

54. Take, for example, the search function. When a user searches for a television show from the Roku home screen, Roku searches across all available streaming applications. What if the same show is available on multiple streaming services? Roku decides which application opens, and so decides which streaming service obtains that viewer's attention and the associated advertising revenue.

55. Another example is promotion and placement on the Roku home screen. When a user downloads a streaming app (like Netflix), where is it placed on the screen? Roku decides. Similarly, Roku's "Featured Free" section highlights particular programs for users, usually available on TRC. Roku decides what programming to elevate to that prime territory.

**C. FAST Channel Carriage Market**

56. Behind the scenes is another critical market: the FAST channel carriage market.

---

[22] Todd Spangler, *Roku Tops 100 Million Streaming Households*, Variety (Apr. 16, 2026), https://variety.com/2026/digital/news/roku-100-million-streaming-households-1236722689/.

There, FAST platforms like Tubi and TRC license content from programmers like Newsmax and other content holders to then distribute those channels to consumers.

57. The licensing market operates through multi-year contracts called carriage agreements. Carriage agreements set the terms on which the parties license content, restrictions on how the content is used or distributed, and the economic terms for distribution and advertising. Programmers and platforms often negotiate these agreements for many months before signing or renewal.

58. A programmer's leverage depends on the quality of its programming, the number of viewers it attracts, and its alternatives. The more viewers a distributor controls, and the fewer comparable distributors available if negotiations fail, the weaker the programmer's bargaining position. Because large distributors know that programmers rely on them to reach a significant number of viewers, programmers are often forced to accept less favorable terms. Conversely, the more distributors compete for carriage, the better the economics for programmers – particularly smaller programmers like Newsmax.

## III. NEWSMAX'S CHALLENGE TO FOX AND FOX'S ANTICOMPETITIVE RESPONSE

### A. Fox's Television Dominance

59. Fox is a media conglomerate founded by Rupert Murdoch and currently headed by his son, Lachlan Murdoch. Its current market capitalization is approximately $35 billion, making it one of the largest media companies in the world. Fox deals primarily in television, news, and sports broadcasting. Its noteworthy assets include Fox Sports, Fox Business, Fox Television Stations, and Fox News.

60. Fox's marquee television asset is the news channel Fox News. For decades, Fox News has been the highest-rated cable news channel in the United States. As of 2023, Fox News alone generated nearly 70% of Fox's pre-tax profit.

61. Fox has also recently expanded into streaming distribution. In 2020, Fox acquired the FAST platform Tubi for $490 million.[23]

**B. The Rise of Newsmax**

62. Newsmax was founded in 1998 by journalist Christopher Ruddy. Newsmax initially made its mark as a popular conservative news website, *Newsmax.com*, and gained traction as an alternative source of political news, commentary, and lifestyle content. Over time, Newsmax expanded its influence through its digital media properties, including magazines, email newsletters, and subscription-based newsletters. Responding to the consumer demand for center-right-leaning news programming other than that offered by Fox, Newsmax launched Newsmax TV as a pay-TV channel in 2014, introducing a new voice in cable news specifically aimed at competing with Fox News Channel.

63. Newsmax operates as a programmer (and produces the linear channels Newsmax for pay-TV distributors and Newsmax2 for FAST distribution). Newsmax also sells a paid app called Newsmax+, which allows users to access its linear channels and on-demand content.

64. Newsmax's channels compete directly with Fox News Channel and LiveNOW from Fox (Fox's FAST news service).

65. Since launching Newsmax TV in 2014, Newsmax has offered a linear channel through FAST distribution. In 2014, Newsmax began contracting with Roku to distribute Newsmax TV for free on TRC. In 2015, Newsmax launched on Pluto TV.

66. In November 2023, Newsmax made the decision to restrict Newsmax TV to pay-TV distribution and launched a new feed for FAST called Newsmax2. While Newsmax TV offers popular programs like "The Record with Greta Van Susteren," "Greg Kelly Reports," "Rob Schmitt Tonight," and "Finnerty," Newsmax2 offers an original lineup of live news programming, with popular programs like "John Bachman Now," "Ike Wingate America," "David Harris Jr. The Pulse," and "The Leventhal Report with Rick Leventhal," along with breaking news and some

---

[23] Brian Flood, *FOX Corp. bolsters direct-to-consumer capabilities with Tubi deal*, Fox News (Mar. 18, 2020), https://www.foxnews.com/media/fox-corp-bolsters-direct-to-consumer-capabilities-with-tubi-deal?msockid=3a6b72a635e56cac18d1645634bc6d80.

documentaries.[24]

67. Newsmax2 remains a popular FAST channel on both TRC and Pluto TV to this day.

**C. Fox's Anticompetitive Animus Toward Newsmax**

68. Publicly available internal Fox communications reveal that Fox views Newsmax as a significant competitive threat. As Newsmax TV's ratings grew in the wake of the 2020 election, Fox executives and talent traded a flurry of emails, texts, and memoranda revealing Fox's fear of competition from Newsmax.

69. For example, in a text to Fox News' CEO, Suzanne Scott, President Jay Wallace called Newsmax TV's surge "troubling" and something that "can't be ignored." He bluntly stated that he was "[t]rying to get everyone to comprehend we are on war footing." Another Fox executive told Fox News Vice President Raj Shah that Newsmax could "drastically change the landscape" of television news. Ron Mitchell, Fox News' Senior Vice President of Primetime Programming and Analytics, confirmed that he was "worried about Fox losing viewers to Newsmax" and "began tracking the guests booked and topics covered on Newsmax." And Tucker Carlson wrote to his then-producer at Fox News that "an alternative like Newsmax could be devastating to us."

70. Acting on its concerns, Fox has pursued a coordinated, behind-the-scenes campaign to suppress Newsmax (and other emerging center-right news competitors, such as One America News). Irena Briganti, Fox's Public Relations chief, emailed Lachlan Murdoch, Suzanne Scott, and Viet Dinh, Fox's then-Chief Legal and Policy Officer, about the "ammo" and "a coordinated plan of attack" designed to "manag[e] the Newsmax incoming/ratings." And Lachlan Murdoch later confirmed under oath that "Fox News had a proactive plan of attack to deal with the Newsmax issue" using third parties to "avoid Fox News appearing concerned and overreacting."

71. Fox's campaign to suppress Newsmax has been multifaceted. Fox has pressured distributors not to carry Newsmax and has conditioned licenses for its own "must-have" channels on distributors' agreement not to carry Newsmax (or to carry it only on commercially unreasonable

[24] Matthew Keys, *Newsmax launches "Newsmax 2," ends free streaming news channel*, TheDesk (Nov. 5, 2023), https://thedesk.net/2023/11/newsmax-2-free-streaming-channel-shuts-down/.

terms). For example, DISH expressed the desire to carry Newsmax TV on its virtual MVPD, Sling, but could not do so without triggering a Fox requirement that, if Newsmax were carried, Sling would have to carry Fox's lesser-viewed channels in its "basic" plan. That requirement would have exposed DISH to tens of millions of dollars in financial penalties under its Fox contract.

72. Fox has also pressured guests who appeared on Newsmax TV to stop doing so. Fox News Channel producers were told to avoid booking guests who continued to appear on Newsmax TV after being "encouraged" to stop. When Newsmax confronted Fox about this conduct, Fox responded, "Welcome to the big leagues."

73. Fox has also used smear campaigns and intimidation tactics against Newsmax and other competitors. These tactics included hiring private detective firms – directly or through cutout corporations or law firms – to investigate Newsmax executives. Public filings in the *Dominion* litigation confirm Fox's targeting of Newsmax and its founder, Christopher Ruddy. In a November 23, 2020 text exchange produced from Fox's files in that litigation, Raj Shah asked Arthur Schwartz whether a reporter "ha[d] a separate Ruddy hit in the works." Schwartz responded that "[t]hey're making calls" and that he hoped "they have something in the works." Shah also stated that they had "gotten to" another individual, likely right-wing activist Mark Krikorian, "about promoting Fox at Newsmax['s] expense."

74. Fox's campaign to suppress Newsmax extends to the FAST market. After acquiring Tubi in 2020, Fox refused to allow Tubi to carry Newsmax. Indeed, Fox has refused to allow Tubi to carry *any* of the center-right news channels that would compete with Fox News – including Newsmax, Salem News Channel, One America News, Real America's Voice, and The First. That makes Tubi unique among large FAST platforms: other FAST platforms carry at least one of these center-right channels, as well as other opinion-based news channels.

75. Excluding center-right news channels makes no independent business sense for a FAST service seeking to maximize viewership and advertising revenue. Fox's own senior executives have recognized that there is a large and profitable center-right audience. Joe Dorrego, Chief Operating Officer and Chief Financial Officer of Fox News Media, testified that Fox's business strategy rests on appealing to that audience. When asked what Fox would do "if the

addressable market in terms of ideology shifted so that it were no longer profitable to appeal to a center right audience," Mr. Dorrego declined to speculate, explaining that "[Fox] do[es]n't believe the vast majority of the population has shifted out of the center right[.]"[25] The only explanation for Fox's refusal to carry these channels on Tubi is its desire to limit competition from Newsmax and other threats to Fox's crown jewel: Fox News.

## IV. FOX'S ACQUISITION OF ROKU AND DOJ'S RECOGNITION OF COMPETITIVE HARMS

76. On June 15, 2026, Fox announced its intention to acquire Roku.[26] The deal valued Roku at $22 billion, with Fox acquiring Roku for $160.00 per share in a combination of cash and Fox Class A common stock.[27]

77. From the very first press call announcing the merger, Fox made clear its intention to capitalize on Roku's dominant position as "the number one CTV operating system in the United States, reaching over half of all broadband homes" to promote Fox content.[28] As Lachlan Murdoch explained, "discovery of [Fox content] can really be assisted with distribution across Roku and discovery through the Roku home screen which really is the beachfront property in the streaming ecosystem."[29] Fox COO John Nallen agreed: Roku is "the 'front door' to the streaming ecosystem" and, as a result, "the combined company is strategically well positioned, particularly from our vastly enhanced digital presence, footprint and scale."[30]

78. Given its size, the Fox-Roku merger was subject to premerger review under the Hart-

---

[25] Exhibit 1 to Fox Defs.' Appl. for Continued Sealing of Limited Portions of Mot. for Leave To File Suppl. at 74 (233:2-9), *US Dominion, Inc. v. Fox News Network, LLC*, No. N21C-03-257 (Del. Super. Ct. Mar. 16, 2023).

[26] *Fox to Acquire Roku – Conference Call*, U.S. Sec. & Exch. Comm'n (June 15, 2026), sec.gov/Archives/edgar/data/1428439/000114036126025280/ef20076253_form425.htm.

[27] Todd Spangler, *Fox Is Buying Roku in $22 Billion Deal*, Variety (June 15, 2026), https://variety.com/2026/tv/news/fox-acquiring-roku-1236781308/.

[28] *Fox to Acquire Roku – Conference Call*, U.S. Sec. & Exch. Comm'n (June 15, 2026), sec.gov/Archives/edgar/data/1428439/000114036126025280/ef20076253_form425.htm.

[29] *Id.*

[30] *Id.*

Scott-Rodino ("HSR") Act. In HSR review, staff of DOJ or the Federal Trade Commission review the terms and circumstances of a proposed merger to evaluate its likely effects on competition. In some cases, the reviewing agency clears the deal after initial review. But when a proposed merger raises competitive concerns, the agency issues a "Second Request" to examine the transaction more closely. As DOJ has explained, it "does not issue second requests lightly," and most mergers subject to HSR review do *not* trigger Second Requests.[31]

79. In September 2026, DOJ issued a Second Request to review the proposed Fox-Roku merger. Yahoo reported that "[t]he heightened scrutiny centers on concerns raised by competitors about how a Fox-controlled Roku might handle content discovery, advertising data, and home-screen positioning for rival services."[32] And TechCrunch reported that the request "signal[ed] that regulators want a much closer look at how it could affect competition and consumers before deciding whether to clear it," as the merger was "more than just a typical media acquisition."[33] That is because "Fox owns a huge collection of news, sports, and entertainment content, as well as Tubi, its free, ad-supported streaming service. Roku, meanwhile, operates one of the biggest platforms sitting between viewers and that content. Its operating system is built into millions of TVs and streaming devices, giving the company significant influence over how consumers discover and watch streaming services."[34]

80. "Compliance with a Second Request is a lengthy and costly process, typically taking several months and costing millions of dollars."[35] Second Requests require exhaustive productions

[31] *Merger Review Process Initiative – Backgrounder*, U.S. Dep't of Just. (June 25, 2015), https://www.justice.gov/atr/merger-review-process-initiative-backgrounder.

[32] Cris Tolomia, *DOJ Issues Second Request in Fox-Roku $22 Billion Merger Review*, Yahoo!finance (Sept. 9, 2026), https://finance.yahoo.com/media-advertising/articles/doj-issues-second-request-fox-170856609.html.

[33] Lauren Forristal, *DOJ Wants More Answers on Fox's $22B Roku Deal*, TechCrunch (Sept. 9, 2026), https://techcrunch.com/2026/09/09/doj-wants-more-answers-on-foxs-22b-roku-deal/.

[34] *Id.*

[35] *DOJ Revives "Expedited" Merger Review Process*, Davis Polk (July 27, 2026), https://www.davispolk.com/insights/client-update/doj-revives-expedited-merger-review-process.

of documents and data, followed by close scrutiny by regulators – often including multiple meetings with counsel, interviews with relevant employees, and consultation with other industry participants, including affected competitors. A proposed merger cannot close until at least 30 days after the parties substantially comply with the Second Request. In practice, the process typically takes far longer. According to an analysis by Dechert LLP, significant DOJ antitrust investigations in 2025 took an average of 14.1 months.[36]

81. In light of the significant regulatory hurdles associated with a Second Request, Fox and Roku repeatedly stated that the transaction would not close until 2027. On a June 2026 conference call, Fox CFO Steven Tomsic stated: "We expect the deal to close in the first half of calendar year 2027."[37] On an August 2026 earnings call, Fox reiterated that "we expect closing in the first half of calendar 2027."[38] Discussing the Second Request at a September 9, 2026 "FOX Fireside Chat," John Nallen stated in no uncertain terms: "We said it would close in the first half of 2027. We're not changing that at all."[39] As late as November 2, 2026, Lachlan Murdoch told investors that Fox was "continuing to work cooperatively with the DOJ in order to obtain HSR clearance," and he made no mention of any change to the first-half-of-2027 projection.[40]

82. On November 6, 2026, at 9:19 a.m. EST, Fox issued a press release stating that it had

---

[36] *DAMITT 2025 Review: Merger Investigations Neared Record Lows and Remedy Policies Shifted*, Dechert LLP (Jan. 29, 2026), https://www.dechert.com/knowledge/publication/2026/1/damitt-2025-annual-report.html.

[37] *Fox to Acquire Roku – Conference Call*, U.S. Sec. & Exch. Comm'n (June 15, 2026), sec.gov/Archives/edgar/data/1428439/000114036126025280/ef20076253_form425.htm.

[38] *FOX FY2026 Q4 Earnings Call*, Fox Corp. (Aug. 6, 2026), https://media.investor.foxcorporation.com/wp-content/uploads/2026/08/06205327/FOX-FY2026-Q4-Earnings-Call-Transcript.pdf.

[39] *Goldman Sachs Communacopia + Technology Conference 2026*, U.S. Sec. & Exch. Comm'n (Sept. 9, 2026) (presentation delivered by Fox Corporation), https://www.sec.gov/Archives/edgar/data/1754301/000119312526387859/d114415d425.htm#:~:text=We%20announced%20this%20morning%20that%20the%20DOJ%20has%20made%20a%20second%20request%2C%20which%20was%20entirely%20expected.

[40] *Fox Corporation (FOXA) Q1 2027 Earnings Call Transcript*, Seeking Alpha (Nov. 2, 2026), https://seekingalpha.com/article/4960984-fox-corporation-foxa-q1-2027-earnings-call-transcript.

"complet[ed] . . . its acquisition of Roku."[41] The press release made no mention of any DOJ clearance of the deal.

83. Two minutes later, at 9:21 a.m. EST, *Variety* magazine published an article with the opening line: "Surprise! Fox Corp. said Friday it has closed the acquisition of streaming platform Roku, a deal valued at $22 billion, well ahead of the expected 2027 date."[42] Other media outlets similarly reported that the sudden announcement "surprised investors."[43] At that time, there was no indication that DOJ had approved the deal.

84. The industry immediately recognized the significant competitive implications of the Fox-Roku merger. As one industry publication put it: "The deal makes Fox into a major player in streaming, with two of the largest free streaming video platforms on the market in Tubi and Roku Channel, a premium streaming service in Fox One, and perhaps most importantly an install base of more than 100 million households around the world. It is no exaggeration to say that Roku is the gateway to TV (inclusive of Netflix, YouTube, Disney+ etc.) for a significant chunk of the U.S."[44] Another outlet warned of the likely consequences of the merger: "For consumers, it means fewer choices, more commercials and higher prices. For Fox's competitors, it means buried apps, discriminatory terms and lost viewers."[45] In other words, "[t]his is not just a merger; it is also a weapon."[46]

---

[41] *Fox Corporation Completes Acquisition of Roku*, Fox Corp. (Nov. 6, 2026), https://www.foxcorporation.com/news/corp-press-releases/2026/fox-corporation-completes-acquisition-of-roku/.

[42] Todd Spangler, *Fox Closes $22 Billion Roku Takeover, Says Streaming Platform Will Remain 'Open Ecosystem'*, Variety (Nov. 6, 2026), https://variety.com/2026/tv/news/fox-closes-roku-acquisition-1236941275/.

[43] Jamie Lovett, *Roku Is Officially Entering a New Era After Major Streaming Shake-Up*, CBR (Nov. 6, 2026), https://www.cbr.com/roku-fox-merger-finalized/.

[44] Alex Weprin, *Fox Closes Roku Deal, Creating New Streaming Power Player*, Hollywood Rep. (Nov. 6, 2026), https://www.hollywoodreporter.com/business/digital/fox-closes-roku-deal-creating-new-streaming-power-player-1236749375/.

[45] Peter Navarro, *Fox and Roku Want to Own Your TV Screen*, Wash. Times (Oct. 19, 2026), https://www.washingtontimes.com/news/2026/oct/19/fox-roku-want-tv-screen/.

[46] *Id.*

85. About six hours later, at approximately 3:07 p.m. EST, DOJ published a press release "on the Closing of Its Investigation of the Merger of FOX and Roku."[47] The press release implicitly recognized that FAST services occupy a distinct market. It explained that DOJ had "analyzed whether the proposed merger may harm competition among free, ad-supported streaming providers" and concluded that "entry of free, ad-supported streaming providers would be timely, likely, and sufficient to make a substantial risk of harm to competition unlikely."[48] That focus on "entry" of additional FAST services is consistent with the existence of a distinct market for free, ad-supported streaming services.

86. The press release also recognized the possibility that the Fox-Roku merger could cause competitive harms, including by Fox "attempt[ing] to use the Roku platform to harm FOX's content rivals" and by "degrad[ing] the Roku platform."

87. Typically, when DOJ recognizes anticompetitive concerns in a merger, there are two options: *First*, DOJ may pursue a "fix-it-first" remedy "in which the parties to a transaction restructure an otherwise problematic transaction."[49] *Second*, DOJ may pursue a consent decree – a binding court order that imposes firm, clearly defined obligations on the merging parties. When the relief sought is prospective in nature, as here, "the Division needs the power to enforce the agreement that only comes with a consent decree."[50] In all events, DOJ has long made clear that "[r]emedial provisions that are too vague to be enforced, or that can easily be misconstrued or evaded, fall short of their intended purpose and may leave the competitive harm unchecked"; thus, "conduct remedies must be adequate to address identified risks, must be able to be monitored by the

---

[47] *Statement of the Department of Justice Antitrust Division on the Closing of Its Investigation of the Merger of FOX and Roku*, U.S. Dep't of Just. (Nov. 6, 2026), https://www.justice.gov/opa/pr/statement-department-justice-antitrust-division-closing-its-investigation-merger-fox-and.

[48] *Id.*

[49] R. Hewitt Pate, *Antitrust Enforcement at the DOJ - Issues in Merger Investigations and Litigation* at 11, U.S. Dep't of Just. (Dec. 10, 2002), https://www.justice.gov/file/628401/dl.

[50] *Id.* at 12.

division or a court, and must be capable of being effectively enforced in a timely manner."[51]

88. DOJ pursued neither option here. Instead, in its November 6 press release, DOJ set out four "commitments" that Fox allegedly made to address likely anticompetitive harms. *First*, "FOX will continue carrying non-FOX content on Roku for a period of at least 3 years consistent with historical Roku practice."[52] *Second*, "FOX will not discriminate against non-FOX content in search results. For application placement on Roku, FOX will continue to allow users to reconfigure application configurations on the home screen."[53] *Third*, "FOX will continue to provide data products to third parties on commercially reasonable terms consistent with Roku's standard distribution agreement."[54] And *fourth*, "FOX will maintain existing contractual firewall commitments to content partners for competitively sensitive non-FOX content data, including aggregated and non-aggregated data that can be inferred from, or collected through, commercial activities of non-FOX content providers or their uses on Roku products, including click, search, view, and voice data for a period of at least 3 years."[55]

89. Fox's four commitments are not embodied in any consent decree or ordered by any court. Consumers and competitors have nothing more than Fox's word that it will comply – and TRC's contracts with programmers allow TRC to terminate those contracts at will. Even taken at face value, the commitments are inadequate. They do not address the elimination of head-to-head competition between TRC and Tubi at all. They do not govern the economic terms on which programmers are carried (such as revenue shares, advertising-inventory splits, and termination rights). They expire after three years, long before the Roku-powered televisions now in consumers'

---

[51] *Remarks of Deputy Assistant Attorney General Jon Sallet at the American Bar Association Fall Forum* (Nov. 17, 2016), https://www.justice.gov/archives/opa/speech/deputy-assistant-attorney-general-jon-sallet-antitrust-division-delivers-remarks-american.

[52] *Statement of the Department of Justice Antitrust Division on the Closing of Its Investigation of the Merger of FOX and Roku*, U.S. Dep't of Just. (Nov. 6, 2026), https://www.justice.gov/opa/pr/statement-department-justice-antitrust-division-closing-its-investigation-merger-fox-and.

[53] *Id.*

[54] *Id.*

[55] *Id.*

homes are replaced. And they concern conduct – algorithmic search ranking, recommendations, and default placement – that is inherently difficult for rivals, consumers, or regulators to observe and verify. The press release thus underscores the serious competitive risks of the Fox-Roku merger while taking no meaningful steps to address them.

90. After Fox's surprise merger announcement, Newsmax reached out to Fox to express its concern that the "commitments" reflected in the DOJ press release were (a) not clearly enforceable, and (b) vague to the point of being illusory. Newsmax asked Fox to make a contractually binding agreement with Newsmax that would fairly reflect the commitments Fox made to DOJ and sent Fox a proposed term sheet reflecting these commitments. Fox rejected Newsmax's term sheet and declined even to make a counterproposal. That response spoke volumes about the real value of Fox's "commitments": they have none.

## V. RELEVANT PRODUCT MARKETS

91. There are at least three relevant product markets in the streaming television ecosystem. *First*, in the FAST consumer market, FAST platforms like Tubi and TRC compete to provide FAST channels to consumers. *Second*, upstream of the FAST consumer market is the FAST channel carriage market, where those same platforms license FAST channels from programmers like Newsmax. *Third*, there is a Connected TV market through which FAST platform applications are distributed.

### A. FAST Consumer Market

92. In the FAST consumer market, FAST platforms like Tubi, TRC, and Pluto compete to provide FAST channels to consumers. The products in this market are services that provide FAST channels. While some FAST platforms also include an ad-supported video-on-demand component, all FAST platforms offer a linear component.

93. The industry recognizes the FAST consumer market as a distinct market. As Roku's own graphic shows, *supra* ¶ 38, Roku itself acknowledges the unique role of FAST services within the broader free streaming and television ecosystems. Other industry participants likewise separately describe and analyze FAST trends. The public, too, recognizes FAST services as occupying a space distinct from both traditional television and paid streaming services. In Roku's

own words: "Most Roku streamers can identify that they watch FAST platform(s), validating FAST as a distinct media environment."[56]

94. Paid streaming services – like SVODs and virtual MVPDs – are not reasonable substitutes for FAST channels or services. FAST services like TRC are free and require no subscription, while paid services like Netflix require paid subscriptions – in Netflix's case, $8.99 per month for a Standard plan with ads or $19.99 per month for a Standard plan without ads.[57] As industry participants recognize, "Unlike SVOD (Subscription Video on Demand) services, FAST doesn't require subscriptions, logins, or payment credentials, making it an accessible and fast-growing part of the streaming ecosystem."[58]

95. On-demand streaming services – like SVODs and AVODs – are likewise not reasonable substitutes for FAST channels or services, because they offer an entirely distinct viewing experience. As Roku itself has explained: "FAST channels enable the lean-back experience. Streamers are tired of scrolling through menus, trying to find something to watch. With their 24/7 scheduled programming, FAST channels free streamers from this stressful experience."[59] Other market participants have likewise recognized that FAST and on-demand services "differ in user experience and content delivery": "FAST is scheduled and channel-based – replicating the lean-back, passive TV experience," while "AVOD is on-demand and user-controlled."[60]

96. Traditional, non-Internet-based forms of television distribution – broadcast, cable, and satellite – are also not reasonable substitutes for FAST channels or services. Broadcast TV

---

[56] *FAST Is Vast: Demystifying Streaming TV's Next Frontier* 7, Roku, Inc. (2026), https://advertising.roku.com/hubfs/Horizon%20Futures%20+%20Roku%20-%20FAST%20is%20Vast%20Report%202026.pdf.

[57] *Compare*, *e.g.*, Roku, *Roku Channel*, https://www.roku.com/whats-on/the-roku-channel (noting that The Roku Channel is "free"), *with* Netflix, *Plans and Pricing*, https://help.netflix.com/en/node/24926.

[58] *FAST (Free Ad-supported Streaming TV)*, Wurl, https://www.wurl.com/glossary/fast/.

[59] *See 5 Things Advertisers Need to Know About FAST Channels*, Roku Advert. (June 11, 2026), https://advertising.roku.com/en-ca/learn/resources/5-things-advertisers-need-to-know-about-fast-channels.

[60] *FAST (Free Ad-supported Streaming TV)*, Wurl, https://www.wurl.com/glossary/fast/.

distributors are local television stations, often network-affiliated, that provide over-the-air programming using public airwaves. Consumers require an antenna (either built into their television or an external antenna) to access the signals. FAST services, on the other hand, bundle a broad range of live and linear TV programming together for consumers and deliver that programming via the Internet. Cable and satellite TV distributors also require paid subscriptions to access their packages. FAST services have no such requirement.

97. Industry commentators have therefore recognized that although FAST channels were "[i]nitially viewed as being competitive with traditional forms of television distribution, FAST has proven to be *additive*, introducing a younger audience to programming they might not otherwise see" and serving as "a complementary platform operating alongside traditional TV."[61] In other words, FAST channels serve a distinct demand rather than functioning as a close substitute for other forms of television distribution.

98. Finally, user-generated video platforms like YouTube, Instagram, and TikTok are not reasonable substitutes for FAST channels. FAST services are closed systems that do not allow user-generated content; YouTube, by contrast, relies predominantly on user-uploaded content. Because of that difference, the licensing process through which FAST services obtain programming has no analog at YouTube. Programming quality also differs substantially. Only a small fraction of YouTube's content is professionally produced and formatted into uniform, regularly scheduled programs – the kind of content that defines FAST. And YouTube offers only user-selected content, whereas FAST services (even those with a video-on-demand library) necessarily offer linear content.

99. For these reasons, a hypothetical monopolist of FAST services could profitably impose a small but significant and non-transitory worsening of terms on consumers – for example, a material increase in advertising load or a reduction in programming quality – in the FAST consumer market.

[61] Eric Bergner, *Guest Column: As FAST Rises in Streaming, Content Sellers Will Have Better Deal Options* (June 7, 2023), https://uk.news.yahoo.com/guest-column-fast-rises-streaming-202318863.html.

**B. FAST Channel Carriage Market**

100. Upstream of the FAST consumer market is the FAST channel carriage market, in which FAST distributors license content from programmers. Newsmax is a programmer in this market; it licenses its FAST channel, Newsmax2, to distributors. Fox and Roku both own distribution platforms in this market: Fox owns Tubi, and Roku owns TRC.

101. While the programmers in the FAST channel carriage market are numerous, the distributors that operate in this market – FAST platforms – are few and concentrated: they are the same FAST platforms that operate in the FAST consumer market, including Tubi, TRC, and Pluto. Programmers in the FAST channel carriage market rely on competition among these large distributors to ensure that their FAST channels reach consumers.

102. For FAST programmers like Newsmax, distribution through other means is no substitute for distribution through FAST services. For one thing, FAST channels are inconsistently carried by other forms of television distribution, such as cable, satellite, and SVOD services, which charge monthly subscription fees. They are also incompatible with on-demand streaming services, which offer a fundamentally different viewing experience.

103. FAST viewers also differ demographically from viewers of other forms of television: they tend to be younger, more tech-savvy, and more budget-conscious. As one industry commentator noted, FAST channels "introduc[e] a younger audience to programming they might not otherwise see."[62] Because programmers like Newsmax cannot reach these consumers through other distribution channels at comparable scale or cost, those channels are no substitute for FAST services.

104. FAST channels also generally serve purposes distinct from other forms of television. Many FAST channels "promot[e] the availability of that programming on traditional TV platforms,"[63] acting as growth engines for paid television channels and introducing customers to a

---

[62] Eric Bergner, *Guest Column: As FAST Rises in Streaming, Content Sellers Will Have Better Deal Options* (June 7, 2023), https://uk.news.yahoo.com/guest-column-fast-rises-streaming-202318863.html.

[63] *Id.*

programmer's content through a free, entry-level offering. For similar reasons, the content on FAST channels differs from content on paid platforms. For example, since November 2023, Newsmax TV has been distributed only on paid platforms, while Newsmax2, which offers different content, is available on free platforms. Common sense explains this distinction: programmers of live linear channels generally do not license the same channel for free distribution while also licensing it to paid distributors, and paid distributors will police and prevent such dual distribution.

105. For these reasons, a hypothetical monopsonist in the FAST channel carriage market could profitably impose a small but significant and non-transitory worsening of terms on programmers – for example, a reduction in the share of advertising inventory or revenue retained by programmers, or less favorable placement and promotion.

**C. Connected TV Market for Streaming Distribution**

106. CTV refers to the distribution of professionally produced, television-style video programming to a television screen over the Internet – through a smart television with an integrated operating system, or through a television paired with a streaming media device, game console, or set-top box – rather than over a traditional cable, satellite, or over-the-air broadcast signal.

107. Smart TVs are the principal CTV device. Industry publications project that by 2027, more than 75% of U.S. CTV users will stream via built-in smart TV apps, while the remainder stream through add-on devices, like a Roku Streaming Stick, Amazon Fire Stick, or Apple TV.

108. CTVs are distinct from traditional linear televisions. Unlike traditional television, every CTV impression is individually addressable and data-driven, enabling household-level audience targeting, frequency control, and closed-loop, impression-by-impression measurement. CTVs also have dedicated supply- and demand-side platforms, ad exchanges, and measurement providers purpose-built for the CTV environment. For these reasons, traditional linear television generally cannot deliver, at comparable scale, CTV's addressable, individually targeted, and digitally measurable impressions, and its inventory is bought on different terms through different channels.

109. CTVs are also unique and distinct from traditional televisions because of the connection to the Internet and the operating system layer with which viewers interact. Non-

connected televisions do not have Internet access and thus rely on some external input, such as a cable or satellite connection.

110. For users, CTVs are not interchangeable with mobile phones or tablets. CTVs are not portable: users cannot carry them in a pocket or backpack, and they are normally wired rather than cordless. And CTVs – because of their size and their usual placement in a living room or common area – are designed for media watched by more than one viewer at a time. By contrast, the small screens of phones and tablets limit how many people can realistically watch at once.

111. CTV is also unique for distributors from an advertising standpoint. While traditional linear TV inserts pre-sold commercial breaks at predetermined times based on programming schedules, CTV advertising is mostly programmatic, meaning that the purchasing and insertion of the ads is automated on a near real-time basis, not predetermined. CTV also allows for more targeted advertising based on the household.

112. CTVs also offer home-screen advertising opportunities not available on other devices. A consumer using a CTV must pass through the home screen to reach an application, and companies can often place ads or promotions there. A consumer who opens an app or website on a phone (for example, the Netflix app) is not exposed to the same home-screen advertising. CTV users also skew younger than traditional methods of television consumption. The fastest growth of CTV viewership is among Gen Z users.

113. For these reasons, the television industry recognizes CTVs as a distinct market. As one industry resource explains: "Whoever controls the interface controls how people interact with their TV. This impacts everything from what services they watch, what shows they watch and how long they watch."[64] The industry also measures the market share of dominant providers within the CTV market, further indicating that the market stands apart from non-connected televisions, as well as mobile phones or tablets.

---

[64] Alan Wolk, *Why Controlling the TV's Operating System Matters*, TVREV (Apr. 18, 2024), https://www.tvrev.com/news/why-controlling-the-tvs-operating-system-matters.

## VI. RELEVANT GEOGRAPHIC MARKET

114. For all product markets, the relevant geographic market is the United States.

115. With respect to the distribution agreements between programmers and FAST distributors, those contracts are often based on rights limited to the United States.

116. FAST services also typically contain geo-restrictions, so different programming may be available on various FAST services depending on the country in which the user is accessing the service.[65] In some areas of the world, the services may not be available altogether.

## VII. THE MERGER WILL SUBSTANTIALLY LESSEN COMPETITION IN THE FAST CONSUMER MARKET AND FAST CHANNEL CARRIAGE MARKET

117. As independent companies, Fox and Roku already have significant market power in the upstream and downstream FAST markets as the two largest FAST service providers. The merger between them will substantially harm competition in these markets. Indeed, the merger is presumptively anticompetitive because it will result in Fox controlling a monopoly share – 70%+ – of the FAST consumer market and a monopsony share of the FAST channel carriage market, while substantially increasing the Herfindahl-Hirschman Index ("HHI") in both markets. That dramatic increase in market concentration will harm both competition and consumers.

118. According to Nielsen data, TRC currently accounts for approximately 42.6% of all viewing time in the FAST consumer market, and Tubi for approximately 28.4%. The merger will thus create a combined service that accounts for 71.0% of all FAST viewing time. Think tanks and industry publications analyzing the competitive effects of television mergers routinely use share of viewing time as a proxy for market share.[66]

---

[65] Florian Gray, *Tubi Unblocked: Watch Tubi From Anywhere in 2026*, Gizmodo (Oct. 19, 2026), https://gizmodo.com/best-vpn/watch-tubi-abroad.

[66] *See*, *e.g.*, Fred Ashton, *Netflix/WBD Deal Likely to Face Antitrust Investigation*, Am. Action Forum (Dec. 9, 2025), https://www.americanactionforum.org/insight/netflix-wbd-deal-likely-to-face-antitrust-investigation/; John M. Yun, *Evaluating the Sale of Warner Bros Discovery to Netflix from an Antitrust Perspective*, Truth on the Market (Dec. 8, 2025), https://truthonthemarket.com/2025/12/08/evaluating-the-sale-of-warner-bros-discovery-to-netflix-from-an-antitrust-perspective/.

| Service | FAST Market Share |
|---|---|
| TRC | 42.6% |
| Tubi | 28.4% |
| **Merged Company** | **71.0%** |

119. Other measures of market share are consistent. For example, S&P reported that in 2025, "Tubi and The Roku Channel account[ed] for nearly two-thirds" of all ad revenue from the "US FAST sector."[67] Whatever measure is used, the Fox-Roku merger will result in the combined firm having a monopoly share of the market.

120. An HHI calculation underscores the competitive concerns of the merger. For decades, agencies and courts have relied upon the HHI to assess the degree to which a merger increases market concentration within a given relevant market. The HHI of a particular relevant market is calculated by summing the squares of each individual firm's market share. So, for example, a market consisting of four firms with market shares of 30%, 30%, 20%, and 20%, would have an HHI of 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2{,}600$). Courts and antitrust enforcers rely on the market's pre-merger HHI and the increase in concentration, or "delta HHI," resulting from the transaction to determine whether a transaction is presumed likely to violate the antitrust laws.

121. Under the *Merger Guidelines* and case law, "[m]arkets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase," and "[a] merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly."[68]

---

[67] Seth Shafer et al., *Fox looks to Roku to grow reach, revenue*, S&P Global (July 2, 2026), https://www.spglobal.com/market-intelligence/en/news-insights/research/2026/07/fox-looks-to-roku-to-grow-reach-revenue.

[68] U.S. Dep't of Just. & Fed. Trade Comm'n, *Merger Guidelines* § 2.1, at 5-6 (Dec. 18, 2023) (endnote omitted), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf ("*Merger Guidelines*"); *see also*, *e.g.*, *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015) ("The extremely high HHI on its own establishes the prima facie case."); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) ("Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive."); *FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 458-59 (S.D.N.Y. 2024) (finding presumption of harm based on 2023 Merger Guidelines HHI thresholds); *FTC v. Kroger Co.*, 2024 WL 5053016, at *15 (D. Or. Dec. 10, 2024) (same).

122. The *Merger Guidelines* also explain, consistent with longstanding precedent, that "a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points."[69]

123. As the following tables illustrate, the Fox-Roku merger will result in an HHI increase of approximately 2,400, which is presumptively anticompetitive under the antitrust laws:

**Pre-Merger HHI:**

| Service | Market Share | HHI Value |
|---|---|---|
| TRC | 42.6% | 1,814.8 |
| Tubi | 28.4% | 806.6 |
| Pluto TV | 17.7% | 313.3 |
| Samsung TV+ | 6.5% | 42.3 |
| Xumo | 1.8% | 3.2 |
| Vix | 1.3% | 1.7 |
| Vizio | 1.1% | 1.2 |
| Plex | 0.6% | 0.4 |
| | Pre-Merger HHI: | 2,983.5 |

**Post-Merger HHI:**

| Service | Market Share | HHI Value |
|---|---|---|
| Merged Company | 71.0% | 5,041 |
| Pluto TV | 17.7% | 313.3 |
| Samsung TV+ | 6.5% | 42.3 |
| Xumo | 1.8% | 3.2 |
| Vix | 1.3% | 1.7 |
| Vizio | 1.1% | 1.2 |
| Plex | 0.6% | 0.4 |
| | Post-Merger HHI: | 5,403.1 |

124. The elimination of competition between TRC and Tubi would substantially harm competition in both the downstream FAST consumer market and the upstream FAST channel carriage market. In the downstream market, the Fox-Roku merger would create a monopolist with substantially diminished pressure to compete on programming and service quality and greater

[69] *Merger Guidelines* § 2.1, at 6 & n.16 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.") (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364-65 (1963)).

freedom to increase advertising load. The result can be harm to consumers through lower quality, diminished output, and higher ad load.

125. The decrease in output and quality in the downstream market would also harm programmers like Newsmax, who have an interest in delivering high-quality FAST channels to consumers. With respect to output, a merger to monopoly also naturally results in decreased output relative to a competitive market. Any such decrease in output would naturally harm Newsmax, which wants to deliver content to the maximum number of viewers it can reach.

126. As to quality, a combined Fox-Roku monopoly could force Newsmax to accept a higher advertising load across the merged firm's FAST services, including on and around Newsmax's FAST channel, and could capture a larger share of the advertising inventory and revenue that channel generates. The resulting decline in quality would harm Newsmax, which relies on its FAST channel to introduce Newsmax to consumers, build relationships with them, and sell them other Newsmax content. Degrading Newsmax's growth engine will thus have harmful ripple effects across Newsmax's paid products.

127. The Fox-Roku merger will also create a monopsonist in the upstream FAST channel carriage market. Today, Newsmax distributes its FAST channel on TRC, which competes against Tubi and Pluto TV for licensed content and carriage of programmers' channels. By combining the two leading FAST distributors, the transaction leaves programmers like Newsmax with materially less leverage over carriage, placement, promotion, and the economics of distribution. Fox has already blocked Newsmax from Tubi. Now that Fox owns TRC as well, nothing will stop Fox from blocking Newsmax – and other competitive threats to Fox's news channels – from most of the FAST channel carriage market, impeding Newsmax's ability to reach consumers.

## VIII. THE MERGER WILL HARM COMPETITION IN THE STREAMING MARKET BY INCENTIVIZING FOX TO DISADVANTAGE RIVALS

128. After closing, Fox would control the Roku OS and, with it, the home screen, search results, recommendation features such as "Top Picks for You" and "What to Watch," and access to valuable viewer data. Because the home screen drives the overwhelming majority of FAST discovery and viewership, control over placement and search is control over discovery and audience.

129. After closing, Fox would be both the operator of the nation's leading CTV platform and a participant competing on that platform. As the *Merger Guidelines* recognize, a platform operator that is also a platform participant may have a conflict of interest and an incentive to give its own products and services an advantage over other participants competing on the platform. To assess the risk posed by a vertical combination, courts ask whether the merged firm will have both the ability and the incentive to foreclose its rivals from distribution.

130. The Fox-Roku combination satisfies that test. With the Roku OS in its hands, Fox would have the ability to disadvantage rivals – for example, by giving its own services premium home-screen placement, by steering consumers to its own properties when they search for content, and by deprioritizing rivals in recommendation features – and the incentive to do so in order to preference its own services and content and to impede competitive alternatives.

131. For Newsmax, the vertical elements of the transaction create acute risks. Newsmax and Fox compete directly as providers of conservative news: Fox operates Fox News Channel, the highest-viewership cable news channel in the United States, and Newsmax operates Newsmax TV, a direct competitor to the Fox News Channel, as well as Newsmax+, a streaming application that competes directly with Fox's applications Fox Nation and FOX One. Newsmax receives a substantial number of paid subscriptions through Roku, making continued access to Roku's app distribution ecosystem critically important to Newsmax's business and its ability to reach viewers directly.

132. Once Fox controls not only Tubi and TRC but also the Roku OS, Fox will have both the ability and the incentive to disadvantage Newsmax. Fox could disadvantage Newsmax2 through unfavorable FAST-channel placement, reduced promotion, diminished discoverability and search

prominence, or exclusion from distribution opportunities. Similarly, Fox could disadvantage the Newsmax+ app through app-store policies, search rankings, promotional restrictions, technical requirements, or other practices affecting consumer access and subscriber acquisition.

133. A Fox-controlled Roku has a stronger incentive than Roku alone to disadvantage a conservative-news rival such as Newsmax. Fox's own documents identify Newsmax – not CNN or MSNBC – as the competitor that most concerns Fox News, *see supra* ¶¶ 69-70, confirming that viewers Newsmax loses are disproportionately likely to shift to Fox.

134. Fox would have a stronger incentive than Roku alone to disadvantage rivals more generally. Roku relies heavily on licensing from a diverse group of established content providers to populate its FAST offering, which today tempers Roku's incentive to disadvantage those providers on its distribution platform. Once the merged firm controls both Roku's distribution platform and Fox's enormous catalog of content, that restraining incentive is greatly reduced – the merged firm can simply substitute comparable programming from Fox's own networks and Tubi's existing catalog.

135. Fox will also control Roku's contract with Newsmax, which creates clear opportunities to disadvantage its rival. Under the operative version of that contract, Roku can terminate for convenience. Roku also controls the advertising terms for Newsmax's channel. It may demand 30% of the channel's advertising inventory and retain all revenue from it; Newsmax must apply to "reclaim" that inventory, and Roku can approve or deny those requests "in its sole discretion." Alternatively, Roku can select Newsmax for the "Roku Sales Representation Program," under which Roku allocates 100% of the channel's advertising inventory and pays Newsmax 55% of the revenue. Nothing in the contract requires Roku to use its best efforts to sell advertising inventory for Newsmax. To the contrary, the contract requires that Newsmax "will permit Roku to utilize [the advertising inventory] without restriction."

136. The transaction also concentrates valuable viewer data in Fox's hands. Roku tracks viewers' activity and demographic data on televisions running the Roku OS through an identifier known as the Roku ID for Advertising ("RIDA"), which is widely adopted across the streaming ecosystem. After closing, absent strict and enforceable protections, Fox would gain access to

Roku's store of viewer data, including insight into viewers' usage of rival services, heightening the risk that Fox will disadvantage rivals through the home screen and search function and creating a risk of self-preferencing and of foreclosing third parties' access to RIDA.

137. The vertical harms would raise barriers to entry, which are already high in the FAST market. A new entrant must acquire expensive content-licensing rights, develop software to deliver that content, and invest in marketing and platform placement before building an audience attractive to advertisers. Fox could raise those barriers higher still – for example, by refusing to carry a competing service on the Roku OS, making carriage prohibitively expensive, or hampering a rival's growth by limiting its organic discoverability.

138. These vertical harms would be durable and difficult to remedy through conduct conditions. Where the Roku OS is built directly into a television, competitors cannot avoid Roku's distribution bottleneck, and because the average lifespan of a CTV is approximately seven to ten years, experience-degrading conduct would accrue long before a viable alternative platform could be built and deployed.

139. DOJ identified some preliminary mechanisms to reduce these harms, as described in paragraph 88 above. But no enforcement mechanism exists to ensure that Fox honors them.

## IX. NEWSMAX WILL SUFFER ANTITRUST INJURY

140. Newsmax depends on The Roku Channel for the distribution of its FAST news channel. Because the transaction would reduce competition in the relevant market on which Newsmax depends for distribution, Newsmax will suffer antitrust injury of the type the antitrust laws were designed to prevent.

141. Unless the merger is enjoined, Newsmax will be forced to negotiate carriage, placement, and promotion with a merged firm that controls the two leading FAST distributors and the dominant CTV platform – and that competes directly against Newsmax as a provider of conservative news. Newsmax will face diminished leverage over the terms and economics of distribution, the loss of the competition between TRC and Tubi that today disciplines those terms, and the acute risk that the merged firm will degrade Newsmax's placement, discoverability, and access to viewers and data to favor Fox's own competing content.

142. This harm is direct, substantial, and irreparable, and it cannot be adequately remedied by money damages. Injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, is necessary to prevent it.

**CLAIM FOR RELIEF:**

**Violation of Section 7 of the Clayton Act – All Defendants**

143. Plaintiff re-alleges and incorporates, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

144. Fox's acquisition of Roku will substantially and irreversibly lessen competition in interstate trade and commerce for FAST services and for Fox competitors that use the Roku CTV platform, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. In addition, Fox's acquisition of Roku will substantially reduce competition and tend to create a monopoly in the FAST consumer market and a monopsony in the FAST channel carriage market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

145. Newsmax is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, to protect against the injuries threatened by this violation of the antitrust laws.

146. Unless enjoined, the acquisition will have the following effects on the FAST market:

a. Actual and potential competition between TRC and Tubi will be eliminated;

b. Competition for licensing rights for FAST channels will be materially lessened;

c. Negotiated prices for licensing rights for FAST channels will be materially reduced; and

d. The quality of FAST services available through TRC, Tubi, or the merged company will be materially reduced and impaired.

147. Unless enjoined, the acquisition is substantially likely to result in reduced competition, lower quality, and more limited options for streaming content licensors and FAST subscribers.

**PRAYER FOR RELIEF**

For these reasons, Plaintiff requests that the Court award the following relief:

a. Adjudge and decree that the transaction is unlawful because it violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

b. Enter judgment in favor of Newsmax against Defendants;

c. Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, and assignees, and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from consummating the transaction;

d. Award Newsmax its reasonable costs and attorneys' fees, as provided by law, including by 15 U.S.C. § 26; and

e. Award such other relief as the Court may deem just and proper.

DATED: November 18, 2026

/s/ *David L. Schwarz*
Aaron M. Panner (*pro hac vice* to be filed)
David L. Schwarz (Bar No. 206257)
Thomas G. Schultz (*pro hac vice* to be filed)
Mark P. Hirschboeck (*pro hac vice* to be filed)
Rachel A. DeLisle (*pro hac vice* to be filed)
Drew T. Beussink (*pro hac vice* to be filed)
Hojoon Kim (*pro hac vice* to be filed)
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
dschwarz@kellogghansen.com
tschultz@kellogghansen.com
mhirschboeck@kellogghansen.com
rdelisle@kellogghansen.com
dbeussink@kellogghansen.com
hkim@kellogghansen.com

John D. Pernick (Bar No. 155468)
Andrew Johnson (Bar No. 322069)
BERGESON, LLP
111 N. Market St., Suite 600
San Jose, CA 95113
(408) 291-6200
jpernick@be-law.com
ajohnson@be-law.com

*Attorneys for Newsmax Broadcasting, LLC*